# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JON WALLI RAMZAN, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:17-cv-01361 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a traffic-related encounter between an officer of the U.S. Customs and Border Protection and a fellow citizen on the roadways in the Chicago suburbs. Everyone agrees that Officer Joseph Jablonski turned on the emergency lights of a CBP vehicle and pulled over Jon Ramzan, the Plaintiff. But the two motorists disagree about why the officer pulled him over. The officer's story is that he believed that Ramzan was having a medical issue. Ramzan, for his part, tells a story that is decidedly less friendly. He claims that the officer honked and screamed at him. And then put a gun to his head.

Ramzan ultimately sued, claiming that the officer had committed a tort under the Federal Tort Claims Act. The United States (the sole Defendant) now moves for summary judgment, arguing that the officer did not act within the scope of his federal employment. The government basically argues that a local traffic stop was not within his range of responsibilities as a CBP officer, so the United States cannot be liable. The issue boils down to whether the United States is responsible for their encounter on the roadways of suburbia.

The two drivers have strikingly different versions of what took place. But whatever version is true, the result is the same. Defendant did not act within the scope of his employment, and thus the United States is entitled to summary judgment.

**Background**

The pleadings tell different stories about their encounter. Officer Jablonski paints himself as somewhat of a Good Samaritan, trying to help a fellow citizen in need. Ramzan depicts Jablonski as something closer to a menace to society. The pleadings reflect a fundamental disagreement about what took place, and the difference is night and day.

But the facts before the Court at the summary judgment stage are narrower, and undisputed. In its summary judgment motion, the United States doesn't offer Officer Jablonski's version of the story at all. Instead, the government offers *Plaintiff's* version of events, and argues that he has no claim as a matter of law. That is, the government argues that under *Plaintiff's* story, he loses, because the officer went rogue and harassed a motorist for reasons of his own.

Ramzan does not deny that, under his own version of the encounter, the officer acted outside the scope of employment. Instead, Plaintiff argues that under *Officer Jablonski's* story, he gets a trial. Plaintiff contends that Officer Jablonski acted within the scope of employment if, as the officer claims, he was simply trying to help.

So, the government doesn't seek summary judgment based on Officer Jablonski's story, and Ramzan doesn't oppose summary judgment based on his own story. Instead, they do the opposite. The United States puts forward Ramzan's version, and Ramzan points to a few lines of testimony from Officer Jablonski's investigative interview.

Collectively, the parties put undisputed facts on the table. The government filed a Rule 56.1 Statement of Facts that adopted Plaintiff's version of the encounter, and Plaintiff admitted all of those facts. *See* Dckt. Nos. 44, 47. Plaintiff, in turn, offered a few additional facts of his own, based on Officer Jablonski's testimony, and the government admitted them, too. *See* Dckt. Nos. 48, 50. So, the question is whether the undisputed facts require a trial, or entitle the United States to exit the courthouse.

The run-in took place almost ten years ago. At that time, Officer Jablonski was a Canine Enforcement Officer for the CBP. *See* Plaintiff's Response to the United States's 56.1 Statement of Facts ("Plaintiff's Response"), at ¶¶ 2, 9 (Dckt. No. 47); Dckt. No. 44-1, at 35. He worked in the foreign mail unit near O'Hare airport. *See* Dckt. No. 44-1, at 37. His duties included "overseeing the flow of trade and travel entering the United States." *See* Plaintiff's Response, at ¶ 9. He "enforced customs, immigration, and agricultural laws and regulations at United States ports of entry to prevent the illegal trafficking of people, narcotics, and other contraband into the United States." *Id.*

It was a slow work day on February 17, 2010, so he decided to take his government vehicle for a checkup at a local dealership. *See* Dckt. No. 49-3, at 1 ¶ 1. He was driving a fully-marked CBP vehicle (an SUV). *See* Plaintiff's Response, at ¶ 2 (Dckt. No. 47). After service, he drove to the kennel, which took him through Carol Stream, Illinois, a suburb about 30 miles west of Chicago. *See* Dckt. No. 44-1, at 37.

That's where he crossed paths with Plaintiff Jon Ramzan. *See* Plaintiff's Response, at ¶ 1 (Dckt. No. 47). Ramzan stopped at a yellow light "due to the presence of traffic cameras." *Id.* So Jablonski "honked at him." *Id.*

At the "next light," Jablonski upped the ante. *Id.* at ¶ 3. Jablonski got out of the SUV, walked up to his car, and "began pounding on [Ramzan's] driver side door window with his fist." *See* Dckt. 44-1, at 10. He "asked Ramzan if he knew how to drive." *See* Plaintiff's Response, at ¶ 3 (Dckt. No. 47). Jablonski then instructed him to pull over into a parking lot. *Id.* at ¶ 4. Ramzan did not oblige. Instead, he kept driving, and went through a yellow light to get away. *Id.* "I just thought it was some security guy," he later explained. *See* Dckt. No. 49-1, at 4, 12:20-21.

Jablonski wouldn't let it go. Things began to escalate. He caught up to Ramzan and turned on the emergency lights of his CBP vehicle. *See* Plaintiff's Response, at ¶ 5 (Dckt. No. 47). This time, Ramzan pulled over, driving into a nearby parking lot. *Id.* For the second time, Jablonski got out of his vehicle. *Id.* He approached Ramzan's car, "drawing his gun and yelling at him." *Id.*

Fortunately for everyone, two Carol Stream police officers happened to be at the scene. *Id.* at ¶ 6; Dckt. No. 44-1, at 14 (stating that the police officers arrived "within fifteen seconds of the initial stop"). They saw Jablonski pull Ramzan over, and they witnessed Jablonski exit his SUV and approach Ramzan's vehicle. *See* Plaintiff's Response, at ¶ 6 (Dckt. No. 47). But they did not see Jablonski brandishing a weapon.[1] *Id.* at ¶ 7.

The police officers defused the situation. They asked Jablonski why he had pulled Ramzan over. He gave an explanation that is a common denominator of all-too-many traffic-related run-ins: Ramzan had "flipped him off." *See* Plaintiff's Response, at ¶ 8 (Dckt. No. 47).

---

[1] As an aside, in his interview with investigators, Jablonski denied pulling out his gun. *See* Dckt. No. 49-3, at 2-3 ¶ 3. Even so, the parties do not include his denial in their Rule 56.1 Statements of Facts, or in their Responses. No one argues that his denial moves the needle and creates a genuine dispute of material fact. *See* Dckt. Nos. 44, 47, 48, 50. The Court mentions his denial as background only.

Jablonski offered a more charitable explanation of his conduct a few weeks later during an interview with an investigator from CBP's internal affairs unit. He "worried that Ramzan was in trouble, as he was behaving abnormally." *Id.* at ¶ 8; *see also* Dckt. No. 44-1, at 37. Jablonski claimed that he "thought the driver was in need of help or medical attention." Dckt. No. 44-1, at 36. "I was asking the gentleman if he was alright and if he need[ed] any help." *Id.*; *see also* United States's Resp. to Plaintiff's Local Rule 56.1 Additional Statement of Facts, at ¶ 3 (Dckt. No. 50); *id.* at ¶ 5 ("The vehicle was stopped because the driver was having abnormal behavior, and I wanted to know if he needed any assistance.").

The situation deescalated. The police officers talked with each of the two drivers. *See* Dckt. No. 49-3, at 2 ¶¶ 4-6; Dckt. No. 44-1, at 10, 2:39-41; Dckt. No. 44-1, at 26, 2:51-52; Dckt. No. 44-1, at 31, 2:43-52. The police reports say nothing about a driver with a medical issue. Jablonski didn't call for medical attention for Ramzan, and he didn't ask the police officers to make that call, either. *See* Dckt. No. 49-3, at 2 ¶ 6. Apparently, no one at the scene – three law enforcement professionals, counting Jablonski – thought that Ramzan actually needed medical attention. (Otherwise, presumably someone would have called for some.)

The police told Ramzan that Jablonski was with the CBP, and they said that he could file a complaint. *See* Dckt. No. 44-1, at 10. Ramzan ultimately gave a statement to investigators from the CBP, and to the local police department. *Id.* at 9-11, 15-16.

A few years later, after an investigation, the CBP reprimanded Jablonski for "Use of Position for Other than Official Purposes." *See* Dckt. No. 49-2, at 1. According to the letter, "Officer Zalak [from the Carol Stream Police Department] stated the reason you gave him for the traffic stop was because you were given the 'finger.'" *Id.*

Meanwhile, Ramzan advanced a timely claim to the CBP under the Federal Torts Claim Act. He brought this action after exhausting his administrative remedies. *See* Plaintiff's Response, at ¶ 10 (Dckt. No. 47); *see also* 28 U.S.C. § 2675(a).

**Summary Judgment Standard**

A District Court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). The Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). The Court should not "weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citations omitted). The Court must "constru[e] the facts and mak[e] reasonable inferences in favor of the nonmovant." *H.P. by & Through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018) (cleaned up).

If the party moving for summary judgment shows that there is no disputed issue of material fact, the burden shifts to the nonmovant to show more than "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation and internal quotation marks omitted); *see Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact*." *Scott*, 530 U.S. at 380 (emphasis in original, citation and internal quotation marks omitted).

**Analysis**

The dispute boils down to whether the United States can be held liable for the actions of Officer Jablonski. The United States "cannot be sued without its consent." *United States v. Navajo Nation*, 556 U.S. 287, 289 (2009). Congress consented to some suits against the United States in the Federal Tort Claims Act ("FTCA"). The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *See Richards v. United States*, 369 U.S. 1, 6 (1962).

The FTCA waives the government's sovereign immunity for civil suits seeking money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). As the plain text reveals, the waiver does not cover all misconduct. It only covers malfeasance by a federal employee "while acting within the scope of his office or employment." *Id.*

Congress has carved out a number of exceptions to the waiver of sovereign immunity, including certain intentional torts. *See Millbrook v. United States*, 569 U.S. 50 (2013) (explaining the intentional tort exception). The United States retains sovereign immunity for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). But Congress later enacted a "law enforcement proviso" – an exception to the exception – for claims against "investigative or law enforcement officers"

involving six intentional torts, including "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." *Id.*; *see also Millbrook*, 569 U.S. at 54-55. So the waiver of sovereign immunity applies to those types of claims.

The text of the statute points to the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In other words, the FTCA "incorporates the substantive law of the state where the tortious act or omission occurred." *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991); *see also Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law."); *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008); *Mann v. Harvey*, 999 F. Supp. 2d 1087, 1091 (N.D. Ill. 2013) ("Federal law governs whether a federal employee was acting within the scope of his employment . . . but a federal court looks to the law of the state where the alleged acts took place, in this case Illinois.").

Here, the incident took place in Illinois. So Illinois law governs whether Officer Jablonski was "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *Snodgrass v. Jones*, 957 F.2d 482, 485 (7th Cir. 1992) ("Under Illinois law, where the essential facts are undisputed, whether an injury arose out of and in the course of employment presents a question of law.") (cleaned up). "Plaintiff has the burden of showing the contemporaneous relationship between the tortious act and the scope of employment." *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 165, 308 Ill. Dec. 782, 862 N.E.2d 985 (2007).

Illinois defines the scope of employment by drawing upon the Restatement (Second) of Agency. *See Snodgrass v. Jones*, 957 F.2d 482, 485 (7th Cir. 1992); *Pyne v. Witmer*, 129 Ill. 2d 351, 359-60, 135 Ill. Dec. 557, 543 N.E.2d 1304 (1989) ("No precise definition has been accorded the term 'scope of employment,' . . . but broad criteria have been enunciated.")

(adopting 228 of the Second Restatement); *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992). The Second Restatement sets the following boundaries for the scope of employment:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits; [and]
>
> (c) it is actuated, at least in part, by a purpose to serve the master . . . .

Restatement (Second) of Agency § 228 (1958). Illinois courts apply a three-part test, and a plaintiff must satisfy all three parts to show that an employee acted within the scope of employment. *See Adames v. Sheahan*, 233 Ill. 2d 276, 303, 330 Ill. Dec. 720, 909 N.E.2d 742 (2009) ("[A]ll three criteria of section 228 must be met in order to find that an employee was acting within the scope of employment.").[2]

"[I]t is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992) (citing *Pyne*, 129 Ill. 2d at 360). When deciding whether an employee acted within the scope of employment, "courts often look to whether the action furthered the purpose of employment and whether the employee encountered the plaintiff only as a result of conducting official business." *Chambers v. Cross*, 2018 WL 5904461, at *4 (S.D. Ill. 2018); *see also* W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984) ("[The scope of employment] refers to those acts

---

[2] In *Pyne v. Witmer*, 129 Ill. 2d 351, 360-62, 135 Ill. Dec. 557, 543 N.E.2d 1304 (1989), the Illinois Supreme Court looked to the Second Restatement of Agency when defining what it means to act within the scope of employment. The American Law Institute released the Third Restatement of Agency in 2006. *See* Restatement (Third) of Agency § 7.07 (2006). Neither party cites the Third Restatement, let alone argues that it would make a difference. Illinois courts continue to look to the Second Restatement, so this Court follows suit.

which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.").

An employee who acts with "malice, bad faith, or self-interested motivation" does not necessarily act outside the scope of employment. *See Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir. 1998) (citing Illinois cases); *Javier v. City of Milwaukee*, 670 F.3d 823, 829-30 (7th Cir. 2012); *Copeland v. County of Macon*, 403 F.3d 929, 934 (7th Cir. 2005). Even actions "motivated primarily by ill will" can be within the scope of employment if they are "actuated, at least in part, by a purpose to serve the master." *Taboas*, 149 F.3d at 583 (cleaned up); *see also Randi F. v. High Ridge YMCA*, 170 Ill. App. 3d 962, 967, 120 Ill. Dec. 784, 524 N.E.2d 966 (1988) ("[I]f an employee commits an intentional tort with the dual purpose of furthering the employer's interest and venting personal anger, *respondeat superior* may lie; however, if the employee acts purely in his own interest, liability under *respondeat superior* is inappropriate."). Forbidden acts are not necessarily outside the scope of employment, either. *See* Restatement (Second) of Agency § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment.").

The government traces its aim on the first element only, that is, whether Officer Jablonski's conduct was "of the kind he is employed to perform." *See Pyne*, 129 Ill. 2d at 360. The United States basically argues that the CBP is not in the business of performing traffic stops, so Officer Jablonski did not act within the scope of his employment. *See* Dckt. No. 43, at 4. "He was not a village traffic cop." *Id.*

The Court agrees. The U.S. Customs and Border Protection is one of the largest law enforcement agencies in the federal government, with over 60,000 officers and other employees.

10

*See* U.S. Customs and Border Protection, *About CBP*, https://www.cbp.gov/about (last visited Feb. 6, 2020). Created in 2003 as part of the Department of Homeland Security, the CBP is "charged with keeping terrorists and their weapons out of the U.S. while facilitating lawful international travel and trade." *Id.*

According to its Mission Statement, the CBP exists to "safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel." *Id.* As the nation's "first unified border entity," the CBP "takes a comprehensive approach to border management and control, combining customs, immigration, border security, and agricultural protection into one coordinated and supportive activity." *Id.*

The statute that created the CBP reflects its outward-facing mission. The CBP performs "security, trade facilitation, and trade enforcement functions." 6 U.S.C. § 211(c)(1). The Commissioner of the CBP is charged with protecting the nation's borders and facilitating the free flow of international trade. Among other statutory duties, the Commissioner of the CBP shall:

> (2) ensure the interdiction of persons and goods illegally entering or exiting the United States;
>
> (3) facilitate and expedite the flow of legitimate travelers and trade;
>
> (4) direct and administer the commercial operations of U.S. Customs and Border Protection, and the enforcement of the customs and trade laws of the United States;
>
> (5) detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States;
>
> (6) safeguard the borders of the United States to protect against the entry of dangerous goods;
>
> (7) ensure the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland; [and]

>   (8) in coordination with U.S. Immigration and Customs Enforcement and United States Citizenship and Immigration Services, enforce and administer all immigration laws . . . .

*See* 6 U.S.C. § 211(c)(2)–(8).

Officer Jablonski was no exception. The record includes a declaration from Robert Harris, a Supervisory U.S. Customs and Border Protection Officer and Program Manager for Border Security in the Chicago Field Office. *See* Dckt. No. 44-1, at 22-23. He confirmed that the "primary mission of CBP is to detect and prevent terrorists and terrorists' weapons from entering the United States while facilitating the flow of legitimate trade and travel." *Id.* 44-1, at 22 ¶ 3. Officer Jablonski was a small part of that much larger effort:

> As a CBP officer, the scope of Jablonski's responsibilities would have included detecting and preventing terrorists and terrorist weapons from entering the United States, enforcing customs, immigration, and agricultural laws and regulations at U.S. ports of entry, preventing the illegal trafficking of people, narcotics, and contraband into the United States, interacting with carriers, other agencies and foreign entities to exchange information and provide guidance on admissibility/compliance, performing inspection, intelligence analysis, examination, and other law enforcement activities, including the apprehension, detention and arrest relative to the arrival and departure of persons, conveyances, and merchandise at ports of entry.

*Id.* at 22-23 ¶ 3. But "there is no law or policy that would authorize a CBP officer to pull over a motorist for a traffic incident that did not arise from any border-related inspection, function, or activity." *Id.* at 23 ¶ 4.

Noticeably missing from the CBP's duties is patrolling the nation's roadways, looking for drivers in need. The CBP is not a roving, here-to-help-any-way-we-can government agency. The CBP seeks out "smugglers," "traffickers," and "terrorists," not needy motorists. *See* 6 U.S.C. § 211(c)(5). The *Customs* and *Border* Protection is charged with protecting the border and other ports of entry, not run-of-the-mill side streets in suburbia. It does not provide roadside assistance. The CBP is not AAA.

Ramzan's story cannot give rise to a claim because, under his version of events, Jablonski did not act within the scope of his employment. Ramzan contends that Jablonski pulled him over for no apparent reason, screamed at him, and then threatened him with a deadly weapon. Ramzan doesn't claim that Jablonski was carrying out his duties as a CBP official by conducting a search that got carried away. And he doesn't claim that traffic stops were part of Jablonski's line of work.

There is no evidence that Officer Jablonski was looking for contraband, enforcing the immigration laws, or stopping a potential terrorist. *See* 6 U.S.C. § 211(c)(2), (c)(5), (c)(8). The record lacks any facts suggesting that Jablonski was "safeguard[ing] the borders" or otherwise promoting the "security of the United States." *See* 6 U.S.C. § 211(c)(5), (c)(6). Jablonski had no "purpose to serve the master" by pulling him over, and thus Ramzan has no claim against the United States. *See Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir. 1998); *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 168, 308 Ill. Dec. 782, 862 N.E.2d 985 (2007) ("[A]n act is outside of the scope of employment if it has no connection with the conduct the employee is required to perform."); *Wright v. City of Danville*, 174 Ill. 2d 391, 405, 221 Ill. Dec. 203, 675 N.E.2d 110 (1996) ("If the employee's actions are different from the type of acts he is authorized to perform or were performed purely in his own interest, he has departed from the scope of employment."); Restatement (Second) of Agency § 229 (1958) ("To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.").

Ramzan does not present any evidence about the CBP's mission. He also advances no argument that the CBP employed Officer Jablonski to make local traffic stops. And he does not deny that, under *his* story, Jablonski acted outside the scope of his employment. Instead,

13

Ramzan seeks to preserve his case by relying on Jablonski's interview. He latches on to a snippet of Jablonski's testimony, which painted his motives in a more flattering light.

Ramzan hangs his hat on the smallest of hooks. He argues that Officer Jablonski acted within the scope of his employment based on one word used in his investigative interview: duty. Officer Jablonski testified that he pulled over Ramzan because he thought he had a "duty" to help those in need:

> Q: Is it part of your official duties as a CBP Canine Officer to conduct traffic stops?
>
> A: No, but it is my duty to help any people in need.

*See* Dckt. No. 44-1, at 38. Based on that word, Ramzan argues that his case lives to fight another day.[3] *See* Dckt. No. 46.

The government responds by undercutting Officer Jablonski's testimony, saying that his self-serving explanation was unbelievable. It was an "obviously unreliable, after-the-fact rationalization by CPB [sic] officer Jablonski for his motive for pulling Ramzan over." Dckt. No. 49, at 1. It "contradicts Jablonski's statement at the time of the incident," when Jablonski said that Ramzan had flipped him off. *Id.* And the original story, in the government's view, is the "obviously true version." *Id.*

That strategy won't work. A party can't obtain summary judgment by arguing that one set of testimony is more credible than another set of testimony. The whole point of trial is to figure out what facts are more believable. *See U.S. v. Paneras*, 222 F.3d 406, 410 (7th Cir.

---

[3] Ramzan's argument requires some mental gymnastics (but the Court's analysis doesn't turn on the internal tension). He has a claim only if officer Jablonski acted within the scope of employment. Under his argument, his claim survives because Jablonski was trying to *help* him. But that theory sits uncomfortably with his theory of the case, to wit, that the officer put a gun to his head. Apparently the notion is that the officer was trying to help, but then got carried away. A Good Samaritan gone rogue.

14

2000). The jury at trial, not the Court at summary judgment, makes credibility determinations. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Even so, the use of the word "duty" is too slender of a reed to support a genuine issue for trial. "Duty," like "jurisdiction," is a "word of many, too many, meanings." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998). There are all sorts of duties, in all sorts of contexts. What type of "duty" was Jablonski referring to? A civic duty? Religious duty? Moral duty? Philosophical duty? Humanitarian duty? Legal duty? Something else? *Read generally* Cicero, *On Duties* (Loeb Classical Library 1913); Immanuel Kant, *Groundwork of the Metaphysics of Morals* 4:398, 4:399-4:400 (Mary Gregor & Jens Timmermann, eds., Cambridge Univ. Press rev. ed. 2012) (1785) ("To be beneficent where one can is one's duty . . . . The second proposition is: an action from duty has its moral worth *not in the purpose* that is to be attained by it, but in the maxim according to which it is resolved upon.") (emphasis in original).

A free-floating "duty to help" is at a much too high level of generality. It's not much better than a duty to "make the world a better place." Illinois requires more granularity when defining the scope of employment, lest it become all-encompassing and thus meaningless. *See, e.g., Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 165, 308 Ill. Dec. 782, 862 N.E.2d 985 (2007) (defining the "kind [of conduct] [s]he is employed to perform" as "draw[ing] blood, perform[ing] drug screens, conduct[ing] filing and billing, and deliver[ing] medical records"); *Copeland v. County of Macon*, 403 F.3d 929, 932 (7th Cir. 2005) (rejecting the notion that law enforcement officers have a general duty "to report, to help prevent, and to punish child abusers"); *Klingler v. City of Chicago*, 2017 WL 4742192, at *5 (N.D. Ill. 2017) (rejecting the notion that a police officer acted within the scope of his employment because he had a general

duty to "protect people who are at risk of harm regardless of where he is or what he is doing at the time"). In any event, the CBP did not employ Officer Jablonski to help anyone in his path.

## Conclusion

In the end, Ramzan has no claim under either side's story. If Ramzan's story is true, and Officer Jablonski threatened him after pulling him over for no reason, then Plaintiff has no claim. Jablonski wasn't employed to patrol the roads and pull people over (let alone threaten them). But if Officer Jablonski's story is true, and he was trying to help Ramzan when he was acting abnormally, then Plaintiff still has no claim. Helping motorists wasn't in his job description. Officer Jablonski was not hired to pull people over or be a guardian angel on the roadways.

The motion for summary judgment filed by the United States is hereby granted.

Date: February 6, 2020

Steven C. Seeger
United States District Judge